U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JUL -2 PM 12: 11

CLERK

BY_____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT**

| | |
|---|---|
| **R.L. Vallee, Inc.** | ) |
| | ) |
| **and** | ) |
| | ) |
| **WESCO, Inc. and Timberlake** | ) |
| **Associates, L.L.P.** | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Vermont Agency of Transportation**, an | ) |
| Agency of the State of Vermont, and | ) |
| **Joe Flynn** in his official capacity as | ) |
| Secretary of the Agency of Transportation | ) |
| | ) |
| **and** | ) |
| | ) |
| **Federal Highway Administration**, an | ) |
| Agency of the United States Department | ) |
| Of Transportation, **Elaine L. Chao**, in | ) |
| her official capacity as Secretary of | ) |
| Transportation, **Brandye Hendrickson**, in | ) |
| Her official capacity as Acting | ) |
| Administrator of the Federal Highway | ) |
| Administration; and **Matthew Hake**, in his | ) |
| official capacity as Division Administrator | ) |
| for the Vermont Division of the Federal | ) |
| Highway Administration | ) |
| | ) |
| Defendants. | ) |

Case No.: 5:18-cv-104

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES R.L. Vallee, Inc. ("Vallee"),   WESCO, Inc. ("Wesco") and Timberlake

Associates, L.L.P. ("Timberlake"), collectively the "Plaintiffs," by and through their undersigned

counsel, and here complain against defendants the Vermont Agency of Transportation

("VTrans"), Joe Flynn, the Federal Highway Administration ("FHWA"), Elaine L. Chao, Brandye Hendrickson, and Matthew Hake, collectively the "Defendants," as follows:

## **INTRODUCTION**

1.  Plaintiffs seek declaratory and injunctive relief against Defendants for their violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq.* and the Administrative Procedure Act ("APA") 5 U.S.C. §§701-06.

2.  Defendants violated NEPA by failing to conduct a "hard look" at the environmental consequences of a highway project, formally designated as VTrans Colchester Interchange Project HES NH 5600, which entails the proposed construction of a diverging diamond interchange at Exit 16 where U.S. Route 2/7 meets Interstate I-89 in Colchester, Vermont along with the substantial improvement of about a mile long stretch of U.S. Route 2/7 (also known as the "Teddy" Roosevelt Highway) south and north of the interchange, and the expansion of Upper and Lower Mountain View Drive along with the creation of a multi-use path in the area of the interchange.

3.  The whole project is known as the "Double Diamond Project" or simply herein the "Project."

4.  Instead of performing a hard look as mandated by NEPA, the Defendants rushed the Project through the NEPA regulatory process and did not perform an Environmental Assessment ("EA"), or an Environmental Impact Statement ("EIS") for the Double Diamond Project as required by 23 C.F.R §771.115.

5.  Defendants avoided performing these required analyses by wrongfully classifying the Project as a "Categorical Exclusion" ("CE").

2

6.      This classification fails to meet statutory muster and the Project is <u>not entitled to a CE</u> and the materials supporting VTrans' request for a CE are inaccurate, misleading and omitted key details about the Project and the surrounding environment.

7.      A CE is an exception that only applies to projects "which do not individually or cumulatively have a significant effect on human environment." 40 C.F.R. § 1508.4. They are also limited to projects that do not have a substantial effect on traffic patterns.

8.      As detailed herein, the Project has both a significant effect on the human environment, and a substantial effect on traffic patterns.

9.      There are very specific limitations that VTrans and the FHWA have adopted to determine which projects can be classified as CEs. The Project exceeds at least two of those maximum standards, including a provision that prevents CEs from being granted to projects that have more than 5,000 square feet of wetlands impacts.

10.     The Project impacts over 18,000 square feet of wetlands.

11.     In addition, the Defendants, particularly VTrans, did not re-evaluate the initial (wrongful) grant of the CE in light of changed circumstances.

12.     These include the adoption of a phosphorus "Total Maximum Daily Load" ("TMDL")[1] for Lake Champlain, and the designation of Sunnyside Brook as impaired for chloride (for which VTrans is the largest contributor).

13.     As there is no basis in law or science to determine that the Project meets the requirements for a CE, the granting of the CE was nothing more than an arbitrary and capricious agency action in violation of the APA.

---

[1] A TMDL is a term under the Clean Water Act that identifies the maximum amount of a pollutant that a body of water can receive while still meeting water quality standards. 33 U.S.C. § 1313(d)(1)(C).

*3442875.1*

14.    Plaintiffs therefore ask this Court to rule that VTrans and the FHWA's actions violated NEPA and the APA.

15.    Plaintiffs also ask that this Court enjoin VTrans, its agents and or contractors, along with any other third party from performing any work on the Project until VTrans complies with NEPA.

16.    In addition, Plaintiffs ask that the FHWA be enjoined from disbursing any funds for the Project until VTrans and the FHWA comply with NEPA.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action, which arises under the laws of the United States, pursuant to 28 U.S.C. §1331, and 5 U.S.C. §§ 701-06.   This Court also has jurisdiction to enter a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (d) and (e) because the property that is the subject of this action is located in the District of Vermont.

## PLAINTIFFS AND STANDING

19.    The proposed Double Diamond Project will cause an imminent, substantial and concrete injury to Plaintiffs, as well as the public at large, and Plaintiffs are likely to suffer irreparable harm in the absence of an order of this Court granting the relief requested herein.

20.    Plaintiff R.L. Vallee, Inc. ("Vallee") is a Vermont corporation with a principal office in St. Albans, Vermont.

21.    Vallee owns and operates a "Maplefields" convenience store located at 414 Roosevelt Highway in Colchester, Vermont and adjoins the Project.

22.    The Colchester Maplefields store operates twenty-four hours per day.

*3442875.1*

23.     Vallee's Colchester business is dependent on through traffic from Route 2/7 and Interstate I-89.

24.     Vallee's Colchester store requires convenient and safe access to and from Route 2/7 and Interstate I-89.

25.     Vallee's Colchester store has a driveway onto Lower Mountain View Drive.

26.     The exit to Lower Mountain View is necessary for safe ingress and egress for travelers in the southbound lane of Route 2/7.

27.     The construction planned for the Project will be performed immediately in front of Vallee's store and its driveways.

28.     The Project will necessitate the closure of all or parts of Route 2/7 and the I-89 on/off ramps for intermittent periods of time, including possible complete closures overnight.

29.     This will limit and or impede safe access to and from Vallee's property.

30.     The Project will therefore impair and impede the movement of vehicles out of Vallee's entrance onto Mountain View Drive, which is necessary for safe exit for all travelers heading south out of Vallee's Colchester store.

31.     The Project will also create traffic and congestion during the construction period that will significantly impair safe access to Vallee's business.

32.     Vallee will also suffer an imminent, substantial and irreparable injury arising out of the increased dust, dirt and noise that will be generated during the construction of the Double Diamond Project.

33.     The Project will have additional environmental impacts on Vallee.

34.     VTrans currently discharges pollutants and stormwater containing phosphorus and chloride onto Vallee's land from Route 2/7.

*3442875.1*

35.    The Project will continue the discharge of these pollutants on Vallee's property.

36.    In fact, the Project may increase the levels of pollution and stormwater discharged onto Vallee's lands.

37.    In addition, Vallee will suffer immediate and irreparable harm from the discharge of pollutants to Sunnyside Brook.

38.    Vallee discharges its stormwater, including entrained chloride, to Sunnyside Brook.

39.    VTrans also discharges stormwater and pollutants to Sunnyside Brook.

40.    The Project will increase the discharge of stormwater and pollutants, in particular, chloride to Sunnyside Brook.

41.    Sunnyside Brook is impaired by chloride and a TMDL is required.

42.    The increase in chloride discharges from the Project will require Vallee to decrease its chloride discharges to offset VTrans' increase.

43.    This will make Vallee's property less safe, as chloride is a deicing agent and a reduction in deicing application will result in a more dangerous property.

44.    Plaintiff Timberlake Associates, L.L.P. ("Timberlake") is a Vermont limited liability partnership with a principal office in South Burlington, Vermont.

45.    Plaintiff WESCO, Inc. (Wesco) is a Vermont corporation with a principal office in South Burlington, Vermont.

46.    Timberlake and Wesco are related business entities sharing certain common principals and operating as a privately-owned and managed family business.

47.    Wesco owns and operates a convenience store located at 156 Roosevelt Highway in Colchester, Vermont and adjoins the Project.

48.     Timberlake owns the land at 156 Roosevelt Highway in Colchester, Vermont, and leases the land to Wesco, and adjoins the Project.

49.     VTrans has notified Wesco and Timberlake of VTrans' intent to acquire, by eminent domain if necessary, a portion of land owned by Timberlake and occupied by Wesco on which they maintain real and personal property for the construction of the Double Diamond Project.

50.     VTrans has also informed Wesco and Timberlake of VTrans' intent to limit access to Roosevelt Highway from the Timberlake property.

51.     The construction of the Double Diamond Project will therefore displace the real and personal property of Wesco and Timberlake.

52.     Wesco and Timberlake's business is also dependent on through traffic with safe and easy access from Route 2/7 and Interstate 89.

53.     The Project will result in the closure of all or parts of Route 2/7 and the I-89 on/off ramps and will limit and or impede safe access to and from Timberlake's property.

54.     The Project will result in blasting for which VTrans has not determined whether there will be physical damage to, or interference with the operation of, the underground storage tanks and related piping located on Timberlake's land and operated by Wesco.

55.     The Project will impair and impede the safe movement of vehicles out of Wesco and Timberlake's entrance onto Route 2/7.

56.     The Project will also create traffic and congestion during the construction period that will significantly impair safe access to Wesco and Timberlake's business.

57.     This will harm Wesco and Timberlake's business.

7

58.     Wesco and Timberlake will also suffer an imminent, substantial and irreparable injury arising out of the increased dust, dirt and noise that will be generated during the construction on the Double Diamond Project.

## DEFENDANTS

59.     Defendant FHWA is an agency of the federal government within the Department of Transportation responsible for overseeing compliance with NEPA, the Federal Aid Highway Act ("FAHA"), and other federal statutes.

60.     The FHWA approves and provides federal funding for state highway projects, such as the Double Diamond Project.

61.     Defendant Elaine L. Chao is the United States Secretary of Transportation and the head of the United States Department of Transportation.   Secretary Chao is named in this action in her official capacity.

62.     Defendant Brandye Hendrickson is the Acting Administrator of the Federal Highway Administration and is named in this action in her official capacity.

63.     Defendant Matthew Hake is the Division Administrator for the Vermont Division of the Federal Highway Administration and is named in this action in his official capacity.

64.     Hereinafter, FHWA, Secretary Chao, Acting Administrator Hendrickson, and Division Administrator Hake are collectively referred to as the "FHWA Defendants."

65.     Defendant VTrans is an agency of the State of Vermont that is responsible for planning, developing, implementing and maintaining a variety of transportation infrastructure in Vermont and is responsible for ensuring that infrastructure projects within the State of Vermont are compliant with NEPA.

66.    Defendant Joe Flynn is the Secretary of the Vermont Agency of Transportation. Secretary Flynn in named in this action in his official capacity.

67.    Hereinafter, VTrans and Secretary Flynn are collectively referred to as the "VTrans Defendants."

## LEGAL FRAMEWORK

### NEPA

68.    NEPA is the nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

69.    NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and the "NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)-(c).

70.    NEPA requires federal agencies to take a hard look at the potential direct and indirect impacts of proposed actions, as well as the cumulative impacts of those actions.

71.    The hallmarks of a hard look are thorough investigation into environmental impacts and forthright acknowledgement of potential environmental harms.

72.    NEPA requires that agencies take a hard look to ensure that the agencies and the public are adequately informed about the full scope of environmental consequences of proposed action before they happen.

73.    The Council on Environmental Quality ("CEQ"), an agency within the Executive Office of the President, promulgated regulations implementing NEPA at 40 C.F.R. §§ 1500-1508.

9

74.   Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

75.   "Major Federal actions" requiring the preparation of an EIS include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies. . ." 40 C.F.R. § 1508.18(a).

76.   NEPA regulations set forth factors that an agency must consider in determining whether an action may significantly affect the environment, requiring the preparation of an EIS. 40 C.F.R. § 1508.27.

77.   Under NEPA, an agency may first prepare an "environmental assessment" ("EA") to assist the agency in determining whether the environmental impact of a proposed action is "significant," requiring the preparation of a more comprehensive EIS.  40 C.F.R. § 1501.3.

78.   The EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9.

79.   If after preparing an EA, the agency determines that an EIS is not required, it must issue a "finding of no significant impact" that sets forth the reasons why the proposed action will not have a significant impact on the human environment. 40 C.F.R. § 1508.13.

80.   NEPA regulations also set forth a narrow exception, under which an agency may adopt a "categorical exclusion" ("CE") through rulemaking for "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4.

*3442875.1*

81.     If a federal agency's action is properly classified a CE, the agency is not required to prepare an EIS or an EA. *Id.*

82.     However, an agency invoking a CE must have procedures available to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.*

### FHWA NEPA Regulations

83.     FHWA has promulgated regulations to guide the agency in determining whether a proposed agency action requires preparation of an EIS or an EA under NEPA. 23 C.F.R. § 771, *et seq.*

84.     Like the CEQ regulations, the FHWA regulations define three classes of actions and depending on the class, the level of documentation required to satisfy NEPA:

    (1)     Class I actions affect the environment and require an EIS, 23 C.F.R. § 771.115(a);

    (2)     Class II actions are categorical exclusions that do not require an EA or an EIS, 23 C.F.R. § 771.115(b); and,

    (3)     Class III actions are ones in which the significance of the environmental impacts is not clearly established and an EA needs to be prepared.  23 C.F.R. § 771.115(c).

85.     FHWA may only grant a CE for a project if "it includes no significant environmental impacts."  23 C.F.R. § 771.117(a).

86.     FHWA defines a CE as "actions which: do not induce significant impacts to planned growth or land use for the area, do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or

*3442875.1*

other resource; do not involve significant air, noise, or water quality impacts; *do not have significant impacts on travel patterns*; and do not otherwise, either individually or cumulatively, have any significant environmental impacts. *Id.* (emphasis added).

87.    Any action which qualifies for a CE, but could involve "unusual circumstances" will require the FHWA, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE is proper. 23 C.F.R. § 771.117(b).

88.    Under FHWA regulations, "unusual circumstances" include: (1) significant environmental impacts; (2) substantial controversy on environmental grounds; or (3) inconsistencies with any federal, state, or local law, requirement or administrative determination relating to the environmental aspects of the action, among others. *Id.*

89.    FHWA regulations set forth a list of specific CEs that typically do not require NEPA documentation. 23 C.F.R. § 771.117(c)(1)-(30).

90.    The 2013 version of 23 C.F.R. §771.117(d) stated that "additional actions which meet the criteria for a CE in the CEQ regulations (40 CFR § 1508.4) and paragraph (a) of this section may be designated as CEs only after the FHWA approval. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result. Examples of such actions include but are not limited to: (1) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing); (2) Highway safety or traffic operations improvement projects including the installation of ramp metering control devices and lighting."

91.    In 2015, 23 C.F.R. § 771.117 was amended.

12

92. Previous section 771.117(d) was deleted and incorporated into 771.117(c) so that former provisions (d)(1) and (d)(2) became 771.117(c)(26) and (c)(27).

93. As amended, §771.117(c)(26) and (c)(27) provide that: "Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e) of this action" and "Highway safety or traffic operations improvement projects, including the installation of ramp metering control devices and lighting, if the project meets the constrains in paragraph (e) of this section" are actions that normally do not require further NEPA documentation. 23 C.F.R. § 771.117(c)(26)-(27).

94. Paragraph (e) was included in the 2015 amendments and provides that actions "may not be processed as CEs under paragraph (c) if they involve: (1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements; . . . [or], (4) Construction of temporary access, or the closure of existing road, bridge, or ramps, that would result in major traffic disruptions; [or] (5) Changes in access control. . ." 23 C.F.R. § 771.117(e).

95. FHWA regulations currently provide that other actions "may be designated as CEs only after [the FHWA's] approval." 23 C.F.R. § 771.117(d).

96. To obtain a "documented" CE ("DCE"), "the applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result." *Id.*

97. Current FHWA regulations contain a nonexclusive list of ten, numbered 4 through 13, examples of the types of actions which may be designated as DCEs after FHWA

approval. *Id.* Included within the list as No. 13 are actions that qualify under 23 C.F.R. § 771.117(c)(26)-(27), but do not meet the constraints set forth in subparagraph (e) of 23 C.F.R. § 771.117.

98. In addition to the above requirements, VTrans and the FHWA have agreed to certain additional terms to determine when environmental consultation with the FHWA is required and when actions may quality for CEs.

99. These criteria are contained in a June 1999 Programmatic Agreement between the Federal Highway Administration – Vermont Division and VTrans. A copy is attached hereto as Exhibit A.

100. The Programmatic Agreement states that VTrans' projects may qualify as CEs if they do not:

> A. Require a temporary detour outside existing right-of-way, or a temporary wetland or stream crossing which will require non-routine mitigation, or a ramp closure, unless the following conditions are met: (1) provisions are made for access by local traffic and the facility is posted accordingly, (2) businesses dependent upon through traffic will not be unduly affected, (3) the temporary detour or ramp closure will not interfere with local special events, (4) the temporary detour, ramp closure, wetland or stream crossing will not substantially increase the environmental consequences of the action (project).
>
> B. Involve construction in wetlands and/or streams (below Ordinary High Water) totaling more than 5,000 square feet, requiring the Army Corp of Engineers to coordinate with resource agencies per General Permit 58.

101. In addition, the Programmatic Agreement requires that projects which qualified as CEs will be re-evaluated as required by 23 C.F.R. § 771.129.

102. The Programmatic Agreement requires re-evaluations prior to:

> FHWA authorization of Preliminary Engineering (PE), acquisition of any significant portion of the right-of-way (ROW) required for the project, or FHWA approval of Plans Specifications & Estimates (PS&E). Regardless of the foregoing statement, it is understood that the FHWA may authorize

PE for development of an action (project), up to but not including submittal of Contract Plans; with the understanding that appropriate NEPA documentation will be processed prior to commencing the "project design" phase, as defined in the VAOT Project Development Process; or acquisition of ROW. In addition, Re-evaluations *will be* performed at *intervals no greater than three years following the original*, or any subsequent, NEPA determination, *or whenever potentially significant changes have occurred* in: the scope or design footprint of the project, *or the anticipated environmental impacts of the project*, or the proposed mitigation measures to be included in the project. The VAOT Project Manager and Environmental Section will coordinate the Re-evaluation of actions (projects) as required above. The Re-evaluation will consider all applicable Programmatic Categorical Exclusion Criteria. Provided that the project continues to satisfy the Criteria, a Re-evaluation memo will be prepared for the files and a copy will be sent to the FHWA summarizing any changes that have occurred, including the results off review under applicable criteria, and stating that "Based upon re-evaluation of the proposed project, it has been determined that there have been no significant changes in the project scope, design footprint, anticipated impacts, or proposed mitigation measures and the determination that the project qualifies for Programmatic Categorical Exclusion remains valid." (emphasis added)

103.   In general, VTrans is required to re-evaluate whether a CE is valid after a project is defined and changes after the CE are made to the project. Such changes include expansions.

## Administrative Procedure Act

104.   The federal Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, sets forth the procedural rules that agencies must follow to ensure the public has adequate access to information and public participation in the rulemaking process.

105.   The APA also confers a right upon any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to judicial review of that agency action.  5 U.S.C. § 702.

106.   Agency actions subject to judicial review are those provided by statute and final agency actions "for which there is no adequate remedy in a court."  5 U.S.C. § 704.

107.    Pursuant to 5 U.S.C. § 706, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be [ ] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

## FACTUAL BACKGROUND

### The Double Diamond Project

108.    The VTrans Defendants' proposed Double Diamond Project, or simply the Project, (VTrans Project Colchester HES NH 5600(14)) involves the reconstruction of roughly a 1.05 mile stretch of the U.S. Route 2/7 corridor in the Town of Colchester from the Winooski border northward to the U.S. Route 2/7 - Sunderland Woods Road intersection, including the complete redesign and reconstruction of the Exit 16 interchange to Interstate 89 ("I-89") (hereinafter, collectively the Project area is referred to as the "Project Area").

109.    Also included in the Project is the expansion of Upper Mountain View Drive and Lower Mountain View Drive and the subsequent installation of turn lanes.

110.    A map of the location of the proposed Project is set forth below and separately attached hereto as Exhibit B.



*3442875.1*

111.   In the CE Request, as defined below, VTrans describes the Double Diamond Project as including "the construction of a diverging diamond interchange, widening of existing roadway for new turn lanes, cold planning and resurfacing, new traffic signal equipment, new lighting, new signing, and incidental items."

112.   While planning for improvements in the Project Area began in 2009, the Double Diamond design was not selected until 2011.

113.   In 2011, the Chittenden County Metropolitan Planning Organization ("CCMPO") prepared the Exit 16 Scoping Study Colchester, Vermont in partnership with Defendant VTrans. A copy of the 2011 Scoping Study is attached hereto as Exhibit C.

114.   The Scoping Study was financed, in part, through grants from the FHWA.

115.   The Scoping Study found that three purposes and needs supported traffic infrastructure development.

116.   On Page 13 of the Scoping Study, the three goals are identified as: (1) improving safety for all uses in the Project Area, (2) reducing traffic delays and queues at signalized intersections and (3) increasing development potential and opportunities for economic growth in the Project Area.

117.   The Scoping Study looked at three alternatives to meet these goals: (1) widening Route 2/7, (2) the Double Diamond design, and (3) building a roundabout.

118.   In evaluating the alternatives, the Scoping Study considered which alternative would accommodate expected future growth the best. *Id.* at p. 22-23.

119.   Notably, the Scoping Study explained that the Project might be eligible for a CE because it would require only minimum additional rights of way and would not have significant environmental impacts.

120.   This is false.

121.   The Scoping Study concluded that the Double Diamond design was the best alternative and performed best when considering increasing capacity in the Project Area, i.e. it accommodated growth the best.

122.   The Town of Colchester has described the Project as creating capacity for future development in its 2014 Town Plan.

123.   The Town of Colchester stated that the Project would fulfill some of the capacity improvements the cancelled Circumferential Highway was designed to address.

124.   The Double Diamond Project is significant construction.

125.   VTrans most recently estimated that it will cost approximately $8 million to construct and will require two-years for construction.

126.   The Double Diamond Project centers on the construction of a so-called "diverging diamond interchange" and constitutes a major redesign of the Exit 16 interchange to Interstate 89.

127.   The FHWA defines a diverging diamond interchange as a design that:

> "[A]ccommodates left-turning movements onto arterials and limited-access highways while eliminating the need for a left-turn signal phase at signalized ramp terminal intersections. On the cross street, the traffic moves to the left side of the roadway between the signalized ramp intersections. This allows drivers of vehicles on the cross street who want to turn left onto the ramps the chance to continue to the ramps without conflicting with opposing through traffic and without stopping.

*See* FHWA, *Double Crossover Diamond Interchange,* https://www.fhwa.dot.gov/publications/research/safety/ 09054/09054.pdf (last visited June 2018.)

128.   FHWA materials depict the flow of traffic in a typical diverging diamond interchange as shown below, as well as in Exhibit D.

*3442875.1*



Figure 2. Crossover movement in a DCD interchange.

129.   If the Double Diamond Project is built, traffic will pass to the "wrong" side of Roosevelt Highway as it approaches I-89 in order for some vehicles to turn left without crossing lanes with oncoming traffic.

130.   This is a substantial change in existing traffic patterns.

131.   This redesign substantially increases the interchange's capacity to handle traffic.

132.   Also included in the Project is the expansion of Lower Mountain View Drive and Upper Mountain View Drive.

133.   As part of the Project, VTrans will expand each road and install an additional turn lane so as to increase capacity and to decrease wait times at the intersection.

134.   Expansion of Lower Mountain View Drive was included in the Project to accommodate increased traffic from private development and growth at the end of Lower Mountain View Drive.

135.   The Double Diamond Project also entails the expansion of Route 2/7 north of the Exit 16 interchange to accommodate additional lanes in some places.

136.   This will increase the capacity of the roadway.

*3442875.1*

137.   The Project is proposed to be constructed over two "seasons."

138.   The first "season" is proposed to entail construction of off road improvements such as stormwater systems, blasting ledge to allow future expansion, and certain utility relocation.

139.   Due to the location of blasting, closures on parts or all of Route 2/7 and the I-89 ramps will be required during blasting periods.

140.   Further, due to the utility relocation, portions of Route 2/7 will have to close for periods of time to allow the relocation.

141.   The second "season" will entail the construction of the double-diamond interchange and the "on" roadway work.

142.   This work will require closure of at least one lane of Route 2/7 at all times to repave, resurface and expand Route 2/7.

143.   The construction of the Double-Diamond section will likely require the closure of Route 2/7 in its entirety, and the closure of off and on ramps to I-89 for periods of time.

144.   Traffic is so heavy in the area, that this construction is proposed to occur between 8:00 PM and 6:00 AM.

145.   Construction during the day would create extreme traffic problems and the only way to manage that is through night-time construction.

146.   However, due to the nature of the construction (including blasting) some work in both seasons that requires the closure of some or all of Route 2/7 must occur during the day.

147.   It is expected that due to construction, traffic through the area will decrease by up to 30%.

3442875.1

148.    Vallee and Timberlake rely on this traffic, and on Route 2/7's safety and accessibility for business viability.

149.    There has been no assessment made as to the impact of two-years of construction road closures, at night or during the day, construction related traffic diversions or increased delays on business in the area who depend on this through traffic for success.

150.    There was also no assessment made during the planning process as to how the construction of the Project would affect business dependent on through traffic.

<strong>Sunnyside Brook and Lake Champlain</strong>

151.    Sunnyside Brook originates near I-89, Exit 16 in Colchester, Vermont.

152.    Sunnyside Brook flows parallel to the Project Area and on the east side to a point where Sunnyside Brook discharges into Sunderland Brook, which in turn discharges into the Winooski River.

153.    Sunnyside Brook drains several hundred acres in the Town of Colchester and land cover within the watershed is primarily impervious surface associated with commercial development, grass, and lightly wooded forests.  In sum, the Sunnyside Brook Watershed is small and intensely developed.

154.    Sunnyside Brook is hydrologically connected to Lake Champlain.

155.    Pollution that flows into Sunnyside Brook reaches Lake Champlain in a relatively short period of time.

156.    Lake Champlain, into which the waters of the Sunnyside Brook drain, is one of the largest lakes in North America and is bordered by New York, Vermont and the Province of Quebec.

*3442875.1*

157.    Lake Champlain is an important source of drinking water for the region and provides recreational, cultural, aesthetic and economic benefits to the region.

158.    Stormwater discharges from the Project (in existing and proposed state) flow into Sunnyside Brook.

159.    VTrans currently discharges more than *de minimus* levels of pollutants, particularly phosphorus and chloride to Sunnyside Brook.

160.    As early as 2006, the Vermont Agency of Natural Resources ("ANR") had knowledge that Sunnyside Brook had a chloride pollution problem.

161.    In 2006, the ANR first published the results of a study of chloride in Vermont waters in a PowerPoint slide entitled "Chloride in Vermont Surface Waters" (the "2006 Chloride Study"). A true and accurate copy is attached hereto as Exhibit E.

162.    Sunnyside Brook may be the Vermont water that is most contaminated with chloride. The 2006 Chloride Study showed that Sunnyside Brook exceeded the EPA-set level for chronic chloride impairment 79% of the time.

163.    The EPA "chronic-impairment" standard is the level at which harm to aquatic life occurs due to long term exposure. The chronic limit requires the 4-day average not exceed 230mg/L more than once every three years.

164.    In 2006, Sunnyside Brook exceeded the chronic standard for over 200 days in one year and averaged, over the course of the whole year, 261 mg/L.

165.    A more recent study indicates that chloride levels in Sunnyside Brook effectively exceed the chronic impairment level set by the EPA 100% of the time and the average concentration of chloride in Sunnyside Brook has risen to 646.6 mg/L. A true and accurate copy of this more recent study is attached hereto as Exhibit F.

166. In 2008, ANR issued a more extensive analysis of chloride in Vermont Waters entitled "Environmental Implications of Increasing Chloride Levels in Lake Champlain and Other Basin Waters" (the "2008 Lake Champlain Chloride Report"). A true and accurate copy is attached hereto as Exhibit G.

167. The 2008 Lake Champlain Chloride Report determined that the vast majority of chloride in Vermont Waters comes from deicing salts applied to roads, which is carried into waters by runoff from snowmelt and rain. In other words, stormwater runoff transports chloride from roadways into Vermont waters, such as Sunnyside Brook and Lake Champlain.

168. Both the 2006 Chloride Study and the 2008 Lake Champlain Chloride Report were shared with VTrans and therefore VTrans knew that that Sunnyside Brook had a chloride problem well before the Project was planned in 2009.

169. At the time VTrans submitted its CE Request, it knew that the discharges of chloride from its roads and impervious surfaces contributed to chloride levels exceeding EPA standards in Vermont Waters.

170. On October 30, 2014, Vermont adopted a chloride standard for Vermont Waters that mirrored the EPA standard.

171. Sunnyside Brook is now listed as impaired for chloride on the State of Vermont 2016 303(d) List of Impaired Waters, which was approved by the EPA on October 4, 2016.

172. VTrans is the largest single discharger of chloride to Sunnyside Brook.

173. VTrans contributes approximately 22% of all chloride discharged to Sunnyside Brook in a given year, roughly 219 tons.

*3442875.1*

174.    The Project will increase chloride discharges to Sunnyside Brook by approximately three-tons per year.

175.    This will substantially harm Sunnyside Brook and exacerbate its chloride impairment.

176.    No state agency has taken any tangible steps to regulate VTrans' chloride discharges to Sunnyside Brook.

177.    Nor did VTrans' look at its chloride discharges to Sunnyside Brook during the NEPA/CE request stage of planning.

178.    VTrans currently discharges phosphorus to Sunnyside Brook (and Lake Champlain) from the Project Area.

179.    The Project will increase phosphorus discharges by approximately 14 pounds per year.

180.    In 2016, a TMDL for Lake Champlain was approved by the EPA.

181.    The TMDL set limits on how much phosphorus can be discharged to each of Lake Champlain's "segments."

182.    For the "Main Lake" segment, into which the Project discharges, the TMDL requires an approximately 20% reduction in phosphorus discharges per year.

183.    The Project will not reduce phosphorus discharges. Rather, it will increase phosphorus discharges.

184.    VTrans did not consider the Project's impact in light of these facts.

### The Categorical Exclusion Application

185.    On July 31, 2013, VTrans submitted its request for a categorical exclusion, including a cover letter (the "CE Cover Letter") and a "Categorical Exclusion Environmental Analysis" (the "Categorical Analysis") (the CE Cover Letter and the Categorical Analysis collectively referred to as the "CE Request"), to Defendant Hake, the Division

24

Administrator for the Vermont Division of the Federal Highway Administration. A true and accurate copy of the CE Request is attached hereto as Exhibit H.

186. The CE Request contains a number of errors, apparent misstatements and inconsistencies including at least the following set forth in the paragraphs below.

187. Although VTrans describes the Project as the "modernization of a highway," the Double Diamond Project actually involves the complete redesign and reconfiguration of a highway interchange and roadway traffic patterns that will substantially increase the capacity of the interchange to process traffic.

188. The complete redesign of an interstate interchange does not qualify for a categorical exclusion.

189. Moreover, the CE Request clearly states that the purpose of the Double Diamond Project is to "reduce traffic congestion . . . increase traffic flow and Level of Service (LOS), and facilitate mobility in the U.S. Route 2/7 corridor from the South Park Drive to the Rathe Road intersection in the town of Colchester." *See* Exhibit H.

190. The FHWA's own regulations, however, provide that only projects that "do not have significant impacts on travel patterns" may qualify for a CE. 23 C.F.R. § 771.117(a).

191. The CE Cover Letter claims a categorical exclusion for the Double Diamond Project because "[n]o significant environmental impact is expected to result from construction or maintenance of this facility."

192. This is not true.

193. Discharges from the Project will exacerbate existing water quality violations - phosphorus in Lake Champlain and chloride in Sunnyside Brook.

194.   On information and belief, there is no record that the FHWA was informed that the Double Diamond Project will exacerbate water quality violations, or even could exacerbate water quality violations and violate the Clean Water Act, or that VTrans even informed the FHWA that there was a water quality problem in Lake Champlain and/or Sunnyside Brook.

195.   Categorical Analysis, Item 4, states: "Best management practices for stormwater and erosion control . . . after construction . . . will be designed to minimize any potential adverse impacts coming from our roadway."

196.   This statement is not supported in the CE Request.

197.   This statement is also not supported by the facts.

198.   VTrans is not proposing any management techniques to reduce or cap chloride discharges from the Project, despite the alarming levels of chloride in Sunnyside Brook and the fact that the Project, as planned, will add an additional three tons of chloride to Sunnyside Brook per year.

199.   Nor does it appear that VTrans even raised the "chloride issue" with the FHWA in its CE Request despite knowing for many years that Sunnyside Brook exceeded the EPA standard for chloride and that VTrans' discharges contributed to the problem.

200.   Furthermore, it is not true that all best management practices are being employed to prevent phosphorus related impacts.

201.   New phosphorus discharges can be eliminated and total phosphorus discharges from the Project can be reduced without substantial cost by amending the proposed plans with simple design changes, including those encouraged by VTrans' own stormwater guidance documents.

202.   On information and belief, there is also no record that the FHWA was informed that VTrans' phosphorus discharges could be further reduced or that VTrans proposed no changes to reduce chloride discharges.

203.   The Categorical Analysis also claims that there will be no business displacements and that takings will not be substantial. *Id.* at Item 11.

204.   That is also false.

205.   42 U.S.C. § 4601(6)(A) defines a "displaced person" as any person, including a corporation, "who moves from real property or moves his personal property from real property."

206.   Timberlake and Wesco will be displaced from its property as the construction will require Timberlake and Wesco to move personal property from the areas being used for the Project.

207.   Information in the CE Request became outdated as the Double Diamond Project evolved and its scope expanded.

208.   The CE Request claims that the Project will impact only 1,485 square feet of wetland. *Id.* at Items 3 and 4. That is not accurate.

209.   On or about October 16, 2014, one of VTrans' consultants prepared a memo, attached as Exhibit I hereto, indicating that the Double Diamond Project had been changed so as to increase the area of permanent wetland impact by more than five times, impacting 7,730 square feet of wetland.

210.   On April 15, 2016 the same Consultants updated their wetland impact assessment in a memorandum attached hereto as Exhibit J.  As updated, the Project as proposed now will have 17,366 square feet of permeant wetland impacts and 1,250 square feet of temporary

*3442875.1*

impacts for a total of 18,616 square feet of wetland impacts, or .43 acres of wetlands impacts.

211. The 18,000 square feet of impact greatly exceeds the 5,000 square feet maximum limit of allowed wetlands impact for a project to be classified as CE under the Programmatic Agreement between FHWA and VTrans. *See* Exhibit A *supra.*

212. It does not appear that VTrans informed the FHWA Defendants of this change.

213. Nor does it appear that the CE was re-evaluated in light of this change.

214. The CE Request also claims that Project will add 0.88 acres of impervious surface. Again, this is not correct.

215. As the Project evolved, the amount of impervious surface added by the Project doubled.

216. Now, the amount of impervious surface that will be added by the construction of the Double Diamond Project is 1.576 acres.

217. On information and belief, there is no record that the FHWA Defendants were informed of this change.

218. Nor does it appear that the CE was re-evaluated in light of this change.

219. On December 27, 2013, Kenneth R. Sikora, Jr., Environmental Program Manager for Region 1 of the Federal Highway Administration, approved and executed the CE Request determining that "[b]ased upon documentation provided, it has been determined that there is no practicable alternative to the proposed construction in wetlands and that the proposed action includes all practicable measures to minimize harm to wetlands which might result from such use."

220. Following the approval of the CE, Vermont adopted a chloride standard and Sunnyside Brook was declared impaired for chloride.

221.   There is no evidence that VTrans informed the FHWA of this change or considered the impact of this change with regards to the Project.

222.   Following the approval of the CE, the EPA approved a new phosphorus TMDL for Lake Champlain.

223.   The TMDL set specific limits on total phosphorus that could be discharged to each lake segment and set reduction targets for phosphorus discharges for each lake segment.

224.   In the segment the Project discharges into, phosphorus discharges must be reduced by approximately 20%.

225.   There is no evidence VTrans considered this important changed circumstance or informed the FHWA of this change.

226.   As of the filing of this Complaint, there is also no evidence that VTrans re-evaluated the CE after three years passed from the issuance of the CE in 2013.

## Count I
## Misclassification of the Double Diamond Project as a Categorical Exclusion
### (NEPA, 42 U.S.C. § 4321 *et seq.*)

227.   Plaintiffs repeat and reallege, as if fully incorporated herein, all of the foregoing numbered paragraphs and statements.

228.   The Double Diamond Project was designed with federal funds allocated and approved by the Secretary of Transportation, through the FHWA of the United States Department of Transportation.

229.   The FHWA's authorization and funding of the Double Diamond Project constitutes a "major Federal action" under NEPA.

230.   The Double Diamond Project is not entitled to a CE as it results in a complete interchange redesign that will have a substantial effect on travel and traffic patterns.

29

231.   The Double Diamond Project is not entitled to a CE because it was designed, in part, to accommodate and promote growth, including the expected growth from a private development.

232.   The Double Diamond Project is not entitled to a CE because it will result in significant environmental impacts.

233.   The Double Diamond Project is not entitled to a CE as it will, or has the reasonable potential to degrade water quality and cause a significant environmental impact due to the increased chloride discharges into Sunnyside Brook, which is impaired for chloride, and phosphorus discharges to Lake Champlain, which is impaired for phosphorus.

234.   The Double Diamond Project is not entitled to a CE as it results in a significant environmental impact to Sunny Hollow Natural Area through the pollution of Sunnyside Brook which flows through this recreational resource.

235.   The Double Diamond Project is not entitled to a CE because it involves unusual circumstances relating to the impairment of Sunnyside Brook and Lake Champlain, two bodies of water into which the Project will discharge pollutants, namely phosphorus and chloride.

236.   The Double Diamond Project is not entitled to a CE because, at the very least, there is a "substantial controversy on environmental grounds" as reflected by the above environmental impacts and VTrans' failure to include or disclose and of these impacts or facts in its CE Request.

237.   The Double Diamond Project is not entitled to a CE because it will impact more than 18,000 square feet of wetlands, exceeding the 5,000 square feet maximum limit of

allowed wetlands impact for a project to be classified as CE under the Programmatic Agreement between FHWA and VTrans. *See* Exhibit A *supra*.

238. The Double Diamond Project is not entitled to a CE because it will result in ramp and/or road closures and there has been no assessment as to whether affected businesses will be unduly affected.

239. The Double Diamond Project falls within none of the enumerated categories for which a CE may be granted under 23 C.F.R. § 771.117(c), as amended, or the 2013 version of 23 C.F.R. § 771.117(d).

240. The Double Diamond Project is not "modernization of a highway" as alleged by VTrans.

241. It is much more and involves the complete reconstruction and reconfiguration of an interchange and therefore did not qualify as a CE under 23 C.F.R. § 771.117(d) (2013).

242. The Double Diamond Project is also not a highway safety of traffic operations project. Rather, the Double Diamond Project is the redesign and configuration of state highway and expansion of local roads designed to increase highway capacity. It involves much more than ramp metering or lighting.

243. Further, the Double Diamond Project does not qualify for a CE because VTrans' CE Request did not satisfy the threshold requirement of *establishing* that "significant environmental effects will not result" from the proposed Double Diamond Project.

244. Rather, VTrans only stated that "no impact was expected" and VTrans conducted little to no research to support this conclusion.

245. The grant of the CE was therefore arbitrary, capricious, not supported by substantial evidence in the Administrative Record and not in accordance with law.

31

**Count II**
**Failure to take a Hard Look at New Information and Changed Circumstances**

246. Plaintiffs repeat and reallege, as if fully incorporated herein, all of the foregoing numbered Paragraphs and statements.

247. NEPA requires federal agencies to take a hard look at new information or changed circumstances that could alter the results of a prior environmental analysis, and determine whether supplemental review is required.

248. The FHWA's regulations provide for the re-evaluation of CE's in response to "new" information.

249. VTrans and the FHWA's Programmatic Agreement in 1999 also requires a re-evaluation when the environmental impacts of a project change and/or after three years pass since the initial grant of a CE.

250. After the CE was approved, Sunnyside Brook was declared formally impaired for chloride under the Clean Water Act.

251. VTrans is the single largest contributor of chloride to Sunnyside Brook.

252. The Project will increase chloride discharges to Sunnyside Brook.

253. The CE was not re-evaluated in light of this change.

254. After the CE was approved, the EPA approved a TMDL for Lake Champlain which sets forth phosphorus discharge goals and targets to address Lake Champlain's phosphorus impairment under the Clean Water Act.

255. The Project will increase phosphorus discharges to Lake Champlain.

256. In addition, since the grant of the CE, the scope of the Project has expanded, and as a result, the amount of new, impervious surface that will be added by the Double Diamond Project nearly doubled.

*3442875.1*

257. The CE was not re-evaluated in light of this change.

258. Furthermore, after VTrans' CE Request was approved on December 27, 2013, a VTrans consultant concluded that because the plans for the Double Diamond Project had changed as the scope of the Project expanded, the Project would impact over 18,000 square feet of wetland.

259. In its CE Request, VTrans informed the FHWA that the Project would only impact 1,485 square feet of wetland.

260. Even though changes to the plans for the Double Diamond Project increased the area of permanent wetland impact by more than five times, from 1,485 to 18,000 square feet of wetland, the CE was never re-evaluated in light of this significant change.

261. In addition, more than three years have passed since the grant of the CE.

262. Defendants are required to re-evaluate the CE after three years and Defendants have not done so.

263. Defendants' failure to re-evaluate the CE after three years and in light of  new information including, the 2016 listing of  Sunnyside Brook as  impaired for chloride, the increase in impervious surface, and the increase in wetlands impact, was therefore arbitrary, capricious, not supported by substantial evidence in the Administrative Record and not in accordance with law.

<u>**Count III**</u>
**Approval of Funding of the DDI in violation NEPA and APA**

264. Plaintiffs repeat and reallege, as if fully incorporated herein, all of the foregoing numbered Paragraphs and statements.

265. The FHWA precludes the expenditure of Federal-aid funds on costs that are not incurred in conformity with applicable federal and state law. 23 C.F.R. §1.9.

33

266.    The Project was not approved in compliance with NEPA and thus is not eligible for Federal-aid funds.

267.    Defendants' funding of the Project therefore violated 23 C.F.R. §1.9 and was therefore arbitrary, capricious, not supported by substantial evidence in the Administrative Record and not in accordance with law.

**WHEREFORE** Plaintiffs respectfully request that this Court enter an Order:

A.    enjoining Defendant VTrans and any contractors or agents from doing or continuing any work on the Project, and enjoining Defendant FHWA from dispersing any funds, until FHWA and VTrans comply with their obligations under NEPA;

B.    declaring that the VTrans and FHWA Defendants' determination that the Double Diamond Project is categorically excluded from a comprehensive NEPA environmental review to be an agency action that is arbitrary, capricious and not in accordance with the law;

C.    declaring that the VTrans and FHWA Defendants' failure to comprehensively review the impacts of the Double Diamond Project on the human environment and evaluate the Double Diamond Project's impact on impaired watersheds of the United States to be agency action that is arbitrary, capricious, and not in accordance with the law;

D.    declaring that the VTrans Defendants' failure to re-evaluate the CE for the Double Diamond Project after three years and in light of new information, including the impairment of Sunnyside Brook for chloride in 2016, the increase in impervious surface area from the Project and the increase in amount of wetland impacted by the Project, to be agency action that is arbitrary, capricious, and not in accordance with the law;

34

E.      requiring that Defendants perform their statutory duties, including but not limited to, completing an appropriate environmental review under NEPA, in accordance with the law; and,

F.      granting Plaintiffs their costs, disbursements, attorneys' fees and expert fees pursuant to 28 U.S.C. § 2412 and 33 U.S.C. § 1365.


Dated at Burlington, Vermont this the 2nd day of July, 2018.


PRIMMER PIPER EGGLESTON & CRAMER PC

By:   *Jon Anderson /JG*

        Jon Anderson, Esq.
        Jeremy S. Grant, Esq.
        30 Main Street, Suite 500
        P.O. Box 1489
        Burlington, VT 05402-1489
        802-864-0880

        *Attorneys for R.L. Vallee, Inc.*


LAW OFFICE OF DAVID L. GRAYCK, ESQ.

By:   *David Grayck /JG*

        David L. Grayck, Esq.
        57 College Street
        Montpelier VT 05602
        (802) 223-0659
        david@graycklaw.com

        *Attorney for WESCO, Inc., and Timberlake
        Associates, L.L.P.*

## VERIFICATION

I, Rodolphe Vallee, the duly authorized representative of R.L. Vallee, Inc., verify under the pains and penalties of perjury that the facts set forth in the foregoing Complaint for Declaratory and Injunctive Relief are true and correct to the best of my knowledge, information, and belief.

**R.L. Vallee, Inc.**

Dated:  June 29, 2018.                    By:  _____

Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN

On this, the 29th day of June, 2018, before me, personally appeared Rodolphe Vallee, duly authorized agent of R.L. Vallee, Inc., and executed the foregoing instrument for the purposes herein contained.

_____
Notary Public

_____
Commission Expires

3442875.1

## **VERIFICATION**

I, _David Simendiger_, the duly authorized representative of WESCO, Inc., verify under the pains and penalties of perjury that the facts set forth in the foregoing Complaint for Declaratory and Injunctive Relief are true and correct to the best of my knowledge, information, and belief.

**WESCO, INC.**

Dated: June 29 , 2018.                           By: _____
                                                      Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN

On this, the 29 day of June, 2018, before me, personally appeared _David Simendiger_ ,

duly authorized agent of WESCO, Inc., and executed the foregoing instrument for the purposes

herein contained.

_____
Notary Public  David L. Gruych

2/10/2019
_____
Commission Expires

## **VERIFICATION**

I, _David Simendiger_, the duly authorized representative of Timberlake Associates,

L.L.P., verify under the pains and penalties of perjury that the facts set forth in the foregoing

Complaint for Declaratory and Injunctive Relief are true and correct to the best of my

knowledge, information, and belief.

**Timberlake Associates, L.L.P.**

Dated: June _29_, 2018.                    By: _____

Duly Authorized Agent


STATE OF VERMONT
COUNTY OF CHITTENDEN

On this, the _29_ day of June, 2018, before me, personally appeared _David Simendiger_ ,

duly authorized agent of Timberlake Associates, L.L.P., and executed the foregoing instrument

for the purposes herein contained.

Notary Public  David L. Graycik

2/10/2019
Commission Expires