UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

R.L. VALLEE, INC., WESCO, INC., and )
TIMBERLAKE ASSOCIATES, L.L.P., )
                                               )
    Plaintiffs, )
                                                 )
    v. )                          Case No.: 5:18-cv-104
                                                 )
VERMONT AGENCY OF )
TRANSPORTATION, *an Agency of the State* )
*of Vermont*; FEDERAL HIGHWAY )
ADMINISTRATION, *an Agency of the United* )
*States Department of Transportation*; )
ELAINE L. CHAO, *in her official capacity as* )
*Secretary of Transportation*; NICOLE R. )
NASON,[1] *in her official capacity as* )
*Administrator of the Federal Highway* )
*Administration*; MATTHEW HAKE, *in his* )
*official capacity as Division Administrator for* )
*the Vermont Division of the Federal Highway* )
*Administration*; and JOE FLYNN, *in his* )
*official capacity as Secretary of the Agency of* )
*Transportation*, )
                                                )
    Defendants.

### ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT, AND PLAINTIFFS' MOTION TO REOPEN ORAL ARGUMENT
### (Docs. 33, 36, 39, 48)

    Plaintiffs challenge defendants' decision in 2013 to approve a highway redesign project in Colchester, Vermont without preparing an environmental impact statement ("EIS"). Plaintiffs proceed under the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 et seq. and the Administrative Procedure Act "APA"), 5 U.S.C. § 706. Defendants respond

---

[1] Nicole R. Nason is substituted for Brandye Hendrickson as defendant. *See* Fed. R. Civ. P. 25(d). The Clerk is directed to amend the caption to reflect this change.

1

that the project did not require an EIS because it qualified for treatment as a categorical exclusion ("CE") as defined by federal regulations.  *See* 40 C.F.R. § 1508; 23 C.F.R. § 771.117.

Pending before the court are Plaintiffs' motion for summary judgment (Doc. 33), Defendants' cross-motions for summary judgment (Docs. 36, 39) and Plaintiffs' motion to reopen oral argument to discuss new facts.  (Doc. 48).

The court GRANTS defendants' cross-motions for summary judgment.  Plaintiffs' motion for summary judgment is DENIED.  Plaintiffs' motion to reopen is DENIED.

## FACTS

Route 7 runs the length of Vermont from north to south along the western edge of the state.  It enters Vermont at Pownal and passes through Bennington, Manchester, Rutland, Middlebury and Burlington before ending at the Canadian border at Highgate Springs.  It is a two-lane state highway in most areas, widening to four lanes as it passes through the larger cities and towns.  North of Burlington, the highway passes through Winooski and enters Colchester, running beneath I-89 and through the Exit 16 interchange.  At this location, Route 7 is a four-lane highway.

Exit 16 is a conventional clover-leaf interchange with entrance and exit in both directions.  Traffic is often heavy.  Many drivers turning from Route 7 onto the interstate ramps must complete a left turn against oncoming traffic.  These turns are governed by green-arrow signals which provide a short-lived opportunity to complete a left turn.  When the green arrow is not showing, left-turning cars must wait in the inner travel lane for a break in oncoming traffic.

Heavy traffic flow also creates congestion at the intersection of Route 7 and Mountain View Drive a short distance north of the Exit 16 interchange.  To the west, Upper Mountain View Drive provides access to the offices and businesses at Water Tower Hill.  To the east, Lower Mountain Drive provides access to a large Costco store and other businesses.

The Chittenden County Metropolitan Planning Organization ("CCMPO") and highway planners at the Vermont Agency of Transportation ("VTrans") and the Federal Highway Administration ("FHWA") have long sought to reduce traffic delays and accidents in the vicinity

of Exit 16.  This case concerns the proposal VTrans and the FHWA approved in 2013 to replace the present system of left turns with a "double crossover diamond" intersection ("DCD").

Plaintiffs claim that the FHWA and VTrans failed to prepare an EIS as required by NEPA.  Defendants respond that the proposed project did not require an EIS because it qualified for a "categorical exclusion" under the regulations promulgated by the Environmental Protection Agency ("EPA").

### Administrative Record

The FHWA and VTrans have provided the administrative record ("AR") comprising the documents relied upon by the defendants in reaching their decision that the Exit 16 project (including the DCD as well as conventional improvements to the Mountain View Drive intersection) qualified for a categorical exclusion under NEPA regulations.  (Doc. 30-1 ¶¶ 3-5.) The court's "on-the-record" review of the defendants' decision-making is confined to the AR. *Camp v. Pitts*, 411 U.S. 138, 142 (1972) ("focal point for judicial review [under the arbitrary and capricious standard] should be the administrative record already in existence, not some new record made initially in the reviewing court.").

For more than 10 years, the CCMPO has studied design alternatives in the Exit 16 location.  The CCMPO is a regional planning authority with statutory authority to provide recommendations to the VTrans. 19 V.S.A. § 10(b)(d)(1).  In 2009, the CCMPO released the results of its Exit 16 Circulation Study which "helped identify corridor issues and develop viable alternatives for improvements…".  AR 000065  The CCMPO formed a steering committee which included representatives from the Town of Colchester, the CCMPO, the VTrans, the FHWA and representatives of the local business community.  AR 000065

In December 2011, the committee released its "Exit 16 Scoping Study."  AR 000059-94. The Scoping Study is a comprehensive document which examines the issue of decreasing traffic delays and improving safety at Exit 16 from many perspectives.  These include traffic congestion, crash rates, wetland and agricultural land concerns, archaeology and historic preservation, hazardous waste sites, and impact on abutting properties.  The Scoping Study concludes that the construction of a DCD intersection at Exit 16 was best calculated to improve traffic conditions.

The DCD alternative performs substantially better than the conventional alternative in improving congestion and increasing safety by eliminating left turn conflicts with oncoming traffic at the interchange area.  Both alternatives address the future development issues in the study area by increasing capacity, improving efficiency of the highway system thereby allowing future growth in the area.

AR 000091

The DCD is a relatively new type of intersection, developed to reduce delay from left-turning traffic at highway interchanges.  Traffic in each direction is directed from the conventional right-hand side of the road to the left as it passes beneath the interstate highway.  The cross-over is governed by traffic signals.  Because the traffic is temporarily on the left side of the roadway, a left turn onto the highway entrance ramp is possible without yielding to oncoming traffic or waiting for a green turn arrow.  After passing through the interchange, traffic is routed back to the right side of the roadway.

The Scoping Study also considered conventional improvements to the traffic signals as well as the addition of a roundabout.  It concluded that the DCD option was superior:

Both the Conventional and DCD alternatives meet the Purpose and Need for this project by relieving congestion, with resulting safety benefits.  The DCD alternative performs substantially better than the conventional alternative in improving congestion and increasing safety by eliminating left turn conflicts with oncoming traffic at the interchange area.  Both alternatives address the future development issues in the study area by increasing capacity, improving efficiency of the highway system thereby allowing future growth in the area.  The roundabout alternative was found deficient in terms of relieving congestion or increasing safety.

AR 000091

Both the DCD and the alternatives included the addition of a second right and left turn lane for traffic turning south on Route 7 at the Upper and Lower Mountain View Drive intersection.  AR 000081  Similar changes were proposed to the north at the Hercules Drive and Rathe Road intersections.  The Scoping Study rejected the construction of roundabouts as a potential third alternative.

The Scoping Study addressed the potential application of the Categorical Exclusion to the NEPA.

As each of the alternatives require minimal rights of way and do not have any significant environmental or cultural impacts, this project may be eligible for a Categorical Exclusion.  However, the project is estimated to accommodate 11,500 AADT by 2028,

4

which exceeds the allowance stated in the VTrans MOA with FHWA of 10,000 vpd, therefore this determination will require further scrutiny in final design.

AR 000092

Following release of the Scoping Study, defendants decided to proceed with the DCD alternative, including the improvements to the Mountain View Drive intersection.  Defendants recognized that NEPA required the agencies to make a decision about whether the project required an EIS.  By letter dated July 31, 2013, the VTrans communicated its decision that the Exit 16 project qualified for a Categorical Exclusion pursuant to 23 C.F.R.  §§ 771.117(d)(1) and (d)(2).  AR000109  The AOT reasoned that the project "will not involve substantial planning, resources, or expenditures; nor is it likely to induce significant alterations in land use, planned growth, development patterns, traffic volumes, or traffic patterns."  AR 000577  Instead, in AOT's view, the project consists of "modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, and adding auxiliary lanes…."  AR 000577  Federal Highway Administration concurred in the decision on December 27, 2013.  AR 001993

### ACT 250 Land Use Permits

It is not possible to understand the dispute over the DCD improvement without also considering the related state litigation over the state land-use permits issued to Costco for the construction of a Costco-brand fuel pumping station and to the Vermont Agency of Transportation for the construction of the DCD.

### A.  Costco permits

On January 24, 2013, the District #4 Environmental Commission issued its decision granting an amended land use permit to the Costco project.  AR001984  The decision reflects concern over traffic congestion and the proposed improvements to Exit 16.  In its written findings, the Commission conditioned "the permit on completion of the Lower and Upper Mountain View Drive improvements and submittal by VTrans of a complete Act 250 application for the proposed Exit 16 improvements before operation of the gas pumps or warehouse expansion can begin."  AR000568  In addition, Costco was required to pay a "fair share" of the costs of certain highway improvements.  AR 500068

5

The opponents of the Costco project (who are essentially the same parties in this case) appealed the decision to the Environmental Division of the Vermont Superior Court and then to the Vermont Supreme Court.  The Vermont Supreme Court upheld the permitting decisions issued by the Environmental Court.  See *In re Costco Stormwater Discharge Permit,* 202 Vt. 564 (2016) (rejecting claim that traffic congestion at Exit 16 and Mountain View Drive should prevent issuance of state Act 250 permit).

**B.  VTrans permits**

In  2016, the District #4 Environmental Commission issued stormwater and Act 250 permits to VTrans allowing the construction of the DCD.  The Environmental Division upheld the permits in a series of decisions which were appealed to the Vermont Supreme Court.  In a ruling dated August 30, 2019, the Vermont Supreme Court affirmed the issuance of the stormwater permit and remanded the Act 250 permit for further proceedings related to the release of road salt and phosphorus.  *In re Diverging Diamond Interchange SW Permit*, 2019 Vt. 57.  On remand, the Environmental Division granted the application for an Act 250 land use permit.  *In re Diverging Diamond Interchange A250*, 2020 WL 2303315 (April 16, 2020).  That decision is on appeal.

**ANALYSIS**

This case presents a single issue – does the decision of the FHWA to proceed with the DCD project qualify for a Categorical Exclusion from the NEPA's requirement that the government prepare an environmental impact statement before taking action.

**I.     Arbitrary and Capricious Standard of Review**

In reviewing agency action under NEPA, the court applies the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706, and conducts a review of the administrative record to determine whether the agency action in dispute was arbitrary or capricious.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other ground by Califano v. Sanders*, 430 U.S. 99 (1977).  In conducting its review, the court makes no ruling about the merits of the proposed project.  These principles apply equally to the review of the adequacy of an EIS as well as in this case to the agency's determination that no EIS was required.  The court's review is limited to a determination of whether the administrative record

demonstrates that "[the agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

In an environmental case, the planning documents, expert reports and the other components of the administrative record present factual and technical issues. For this reason, the court's review of the agency's action is deferential. *Kleppe v. Sierra Club*, 427 U.S. 390, 413 (1976). "Deference is particularly appropriate where an agency is interpreting its own regulations in applying a categorical exclusion." *City of Alexandria, Va. v. Fed. Highway Admin.*, 756 F.2d 1014, 1020 (4ᵗʰ Cir. 1985). The Second Circuit recognized this deferential standard in the context of the review of CE determinations in *City of New York v. Interstate Commerce Commission*, 4 F.3d 181, 186 (2d Cir. 1993).

## II.    Regulatory Framework

The National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12, requires federal agencies to prepare a detailed statement concerning the environmental impact of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA provides a broad outline of the requirements for such an EIS. These include consideration of adverse effects, alternatives to the proposed action, the relationship between short-term use and long-term protection of the environment, and the irreversible commitments of resources involved in the proposed action. 42 U.S.C. §§ 4331(2)(C)(ii -v).

Not every action by a federal agency requires an environmental impact statement. "Under NEPA, an [environmental impact statement] or [environmental assessment] is not required unless the contemplated action will affect the environment 'in a significant manner or to a significant extent,' with significance defined in terms of both context and intensity. *Cty. of Seneca v. Cheney*, 12 F.3d 8, 12 (2d Cir. 1993) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 & n.20 (1989)). In some cases, an abbreviated environmental assessment ("EA") will suffice. 40 C.F.R. § 1508.9. In other cases, an action may be entirely excluded from environmental review. Such an exception is called a "categorical exclusion" or CE.

The EPA provides regulatory guidance concerning qualification for a CE through the Council on Environmental Quality. 40 C.F.R. § 1508.4 provides an exception to the EIS requirement for

7

"actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations...". (internal citation omitted).

As contemplated by § 1508.4, the Department of Transportation has promulgated regulations which govern categorical exclusions in the context of federal highway construction and improvements. 23 C.F.R. § 771.117(a) defines categorical exclusions in general terms:

> [A]ctions that meet the definition contained in 40 C.F.R. § 1508.4, and, based on FHWA's past experience with similar actions, do not involve significant environmental impacts. They are actions that: Do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively have any significant environmental impacts.

Subsequent subsections provide non-exclusive examples of specific projects which qualify for a categorical exclusion. These exclusions come in two flavors – those requiring no express approval by the FHWA, known as "c" exclusions, and those which require express approval by the agency. This last group is known as "d" exclusions. (Although these are authorized by 23 C.F.R. § 771.117(d), the "d" stands for "documented" because qualification requires a specific decision.)

Projects eligible for CE status as "c" exclusions include actions such as adding bike lanes or acquiring a scenic easement which are very unlikely to have an environmental impact. 23 C.F.R. § 771.117(c). The "d" exclusions include larger-scale projects with some potential for environmental impact. These include relatively large construction projects such as bus transfer facilities or rest areas. *See* 23 C.F.R. § 771.117(d). The "d" exclusions at issue in this case concern

> Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing).

> Highway safety or traffic operations improvements projects including the installation of ramp metering control devices and lighting.

8

23 C.F.R. § 771.117(d)(1) and (2).[2]

It is necessary to review the recent amendment of 23 C.F.R. § 771.117.  In 2013 when the FHWA and VTrans decided to proceed with the improvements to Exit 16 and Mountain View Drive, the modernization and safety or traffic operations improvement CEs were "d" improvements.  Consistent with the requirements of 23 C.F.R. § 771.117(d) as then in effect, the FHWA determined that the project qualified for CE status in December 2013.  AR 001993  In 2014, the FHWA revised § 771.117.  The agency moved the modernization and highway safety or traffic operations improvements from subsection (d) to (c).  This change eliminated the need for agency approval of the CE.  At the same time, the agency added new language to subsection (c) specifically intended to limit the application of these CEs.  As amended, subsection (c) now includes the following requirement:

(e)  Actions described in (c)(26), (c)(27), and (c)(28) of this section may not be processed as CEs under paragraph (c) if they involve:

(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements. …

(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5) Changes in access control.

23 C.F.R. § 771.117(e).  The parties disagree about the application of the amended version § 771.117 to the approval of the CE in this case.

III.    Plaintiff's Arguments

Plaintiffs provide five reasons why they believe that defendants' decision that the Exit 16 project qualified for categorical exclusion under NEPA was arbitrary and capricious:

---

[2]  As discussed below, the court concludes that the version of 23 C.F.R. § 771.117(d) that was in effect at the time the FHWA made its decision applies.  *See infra* Section III.2.  The language quoted here is from the version in effect between February 19, 2013 and February 11, 2014.  *See* Doc. 46-1.

1.  Highway interchange projects which have a substantial effect on traffic patterns do not qualify as CEs.

2.  The 2014 revisions to 23 C.F.R. § 771.117(d) and (c) changed the requirements for qualification for a CE.  The Exit 16 project no longer qualifies.

3.  VTrans failed to conduct an assessment of all foreseeable impacts of the Exit 16 project.

4.  VTrans's application for a CE fails to demonstrate that "significant environmental effects will not result" as set forth in the 2013 version of 23 C.F.R. § 771.117(d).

5.  The CE is not supported by the administrative record.

The court will address each objection to the CE.

## 1.   Application of the CE process to highway interchange projects

The defendants' determination that a CE designation was appropriate occurred in 2013 in two steps.  VTrans made the initial proposal for designation.  After review, the FHWA accepted the recommendation.

On July 31, 2013, staff at VTrans wrote to an official at the FHWA requesting CE designation.  AR 000577  A detailed "Categorical Exclusion Environmental Analysis Sheet" accompanied the letter.  The Analysis Sheet described the purpose of the project:

> to develop transportation improvements that will increase safety (Hazard Elimination System (HES)), reduce traffic congestion, increase bike/pedestrian safety, increase traffic flow and Level of Service (LOS), and facilitate mobility in the U.S. Route 2/7 corridor from the South Park Drive to the Rathe Road intersection in the town of Colchester.

AR 000579  VTrans identified safety as the primary reason for the improvements.  The area includes a high crash roadway segment and a high crash intersection as well as a lack of pedestrian facilities (sidewalks and pedestrian signals).  It also identified traffic delays at the intersections, including long vehicle queues extending at times onto the northbound lanes of I-89.  The Analysis Sheet states that the "improvements will be designed to accommodate [projected] design year traffic volume…".  AR000579  It described the scope of work:

> Work to be performed under this project includes the construction of a diverging diamond interchange, widening of existing roadway for new turn lanes, cold planing and resurfacing, new traffic signal equipment, new lighting, new signing, and other roadway related work.

10

AR 000579  The Analysis Sheet considered 15 criteria relevant to a CE determination under 23 C.F.R. § 771.117(d) as it was written in 2013.  These included right of way ("[t]akings will not be substantial, and will be limited to narrow strip takings, needed to accommodate minor roadway widening, new sidewalk installations, stormwater treatment via grass swales, utility relocations, and other roadway/signal related items"), social and economic concerns ("The DCD performs substantially better than the conventional and roundabout alternatives by increasing capacity and reducing congestion as well as improving safety (by eliminating left turn conflicts with oncoming traffic), and detours (none).  AR 000582-583

The Analysis Sheet also addressed the "direct, indirect, and cumulative impacts" as defined in the Council on Environmental Quality Regulations (40 C.F.R. §§ 1500-1508).  It listed the sources examined to make this determination.  It concluded that there were no indirect environmental effect (effects caused by the action and later in time or farther removed in distance, but still reasonably foreseeable) and that cumulative impacts (impacts from incremental effects which may be individually minor but collectively significant over time and over a broad geographic distance) were confined to two wetlands comprising 1,485 square feet and an increase in traffic noise affecting "three residential receivers at the north end of the project approach."  AR 000584

Detailed back-up documentation accompanying the Analysis Sheet included an excerpt from the Exit 16 Scoping Study, a 2012 noise study, a 2012 wetland study, a 2012 natural resource review, a 2012 hydrologic study, a 1993 study concerning subsurface petroleum contamination at a neighboring service station, an archaeological review, the transcript of a public hearing conducted by the Vermont Agency of Transportation concerning the Exit 16 project, written public comments, notes from public meetings conducted by the Chittenden County Metropolitan Planning Organization concerning alternative proposals for the Exit 16 location, and other planning and permitting documents.

VTrans submitted its Analysis Sheet and back-up documentation in an effort to obtain a determination by the FHWA that the Exit 16 proposal qualified for CE status.  In December 2013, the FHWA released its decision that CE status applied.  AR 001993

It is against this factual background that the court reviews the decision of the FHWA to approve CE status.  As in other NEPA cases, the standard does not permit the court to impose its

own preferences or decision on the merits of the CE application.  The review is confined to a determination of whether the CE determination is consistent with NEPA and the regulations and case law interpreting the statute and whether the administrative record demonstrates that VTrans and the FHWA considered the relevant factors and articulated a rational connection between the facts found and the choice made.

The first issue raised by the plaintiffs is that a subsection "d" exclusion for this project violates NEPA because 23 C.F.R. § 771.117(a) "forbid[s] the use of a CE for projects that will have 'significant impacts on travel patterns.'"  Plaintiffs' Memo. in support of Motion for Summary Judgment (Doc. 33 at 9).  Section 771.117(a) sets forth a broad definition of categorical exclusions:

> CEs are actions that meet the definition contained in 40 C.F.R. § 1508.4, and based on FHWA's past experience with similar actions, do not involve significant environmental impacts.  They are actions that: Do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

Plaintiffs argue that because increased traffic flow and reduced congestion rank high among the goals of the Exit 16 project, these are disqualifying "impacts on travel patterns." They rely on *West v. Secretary of Department of Transportation*, 206 F.3d 920 (9th Cir. 2000) and *RB Jai Alai, LLC v. Secretary of Florida Department of Transportation*, 112 F. Supp. 3d 1301 (M.D. Fla. 2015), *vacated following settlement*, 2016 WL 3369259 (M.D. Fla. 2016), for their argument that a CE "cannot simultaneously relieve traffic congestion and yet have no significant impact on travel patterns." *West*, 206 F.3d at 929.

The court rejects plaintiffs' position that the project is ineligible for CE status because its purpose is to reduce congestion and wait-times at Exit 16.  A significant impact on travel patterns as the phrase appears in 23 C.F.R. § 711.117(a) is not synonymous with improving the flow of traffic.   If it were, Section 711.117(a) would disqualify most highway improvement projects from CE status.  These projects – great and small – are commonly intended to ease congestion and reduce delays.  That is the nature of highway work.  An improvement in traffic flow does not automatically disqualify a project from consideration as a CE.

12

Subsections (c) and (d) of 23 C.F.R. § 771.117 contain many examples of projects which qualify for CE status while improving the flow of traffic.  These include ridesharing activities, deployment of electronics to improve efficiency or safety, highway modernization, traffic operations improvement projects, including the installation of ramp metering control devices, bridge improvements, and changes in access control.  These CEs are directed at easing traffic flow by reducing traffic volume at peak times or allowing it to move more freely.  Many of these improvements increase capacity.  The presence of these CEs within subsections (c) and (d) is strong textual evidence that the phrase "significant impacts on travel patterns" refers to a more significant change than easing congestion at an intersection.

Both the *West* and the *RB Jai Alai* decisions shed some light on the question of what constitutes a significant impact on travel patterns.  In *West*, the environmental impact resulted from the construction of a new interchange on I-5 a few miles south of Seattle.  The interchange was sought by planners at the city of DuPont, Washington to "accommodate the traffic demands generated by existing growth and sizeable growth forecast for the area," including a new computer chip "campus" for Intel Corporation and a 3,200-acre mixed use development proposed by Weyerhauser Real Estate Co.  *Id.* at 922.

The Ninth Circuit rejected the Department of Transportation's argument that the new interchange qualified for a CE as an approval for change in access control.  It also held that the project was ineligible for CE status because the FHWA regulations forbid the use of a categorical exclusion for projects that will have significant impacts on travel patterns.  The proposed I-5 interchange was proposed "because the [transportation] agencies predicted that the existing interchanges were inadequate to handle the traffic from the anticipated growth."  *Id.* at 929.  Redirecting traffic to a newly constructed exit is a clear example of an impact on travel patterns.

In *RB Jai Alai*, the Florida Department of Transportation sought a subsection (d) CE designation for the construction of a "fly-over" intersection at the junction of two state highways.  The project included the construction of a 375-foot bridge structure, nine lanes of frontage roads, and the acquisition of 10 acres of land and the relocation of thirty-five businesses and one home.  The agency admitted that the project did not fit within any of the subsection "d" categories but

13

resembled the highway modernization, ramp metering and lighting and bridge replacement exceptions. See 23 C.F.R. § 771.117(d)(1)-(3) (2003 and 2011 versions).

The district court ruled against the transportation agencies because a project which greatly increased the capacity of the highways by constructing a new, four-lane elevated overpass "far surpasses the scope of highway projects envisioned by § 771.117(d)." *Id.* at 1322. The court followed *West* in excluding projects from CE status that are primarily directed at increasing highway capacity. It distinguished the project before the court from cases in which projects to widen highways and bridges, add one or two onramps to an existing overpass, reconstruct a road damaged by flooding by relocating it, and replacing a bridge and widening shoulders all qualified for CE status. *See Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542 (W.D. Tex. 2011); *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116 (S.D. Fla. 2005); *Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp. 2d 1216 (d. Or. 1998); *Ware v. U.S. Fed. Highway Admin.*, Civ. AH-04-2295, 2006 WL 696551 (S.D. Tex. Mar. 15, 2006), *aff'd*, 255 F. App'x 838 (5th Cir. 2007); *Public Interest Research Grp. of NJ, Inc v. Fed. Highway Admin.*, 884 F. Supp. 876 (D.N.J. 1995), *aff'd*, 65 F.3d 163 (3d Cir. 1995).

As these cases demonstrate, the language in 23 C.F.R. § 771.117(a) excluding projects from CE status (and therefore requiring an environmental impact statement or other review) concerns projects which have a significant impact on travel patterns because they increase capacity and draw increased traffic or both. These projects include building a new interchange to serve new development (*West*) or replacing a four-way intersection with an overpass and new travel lanes (*Jai Alai*). The language does not exclude all improvements to existing highway infrastructure which relieve congestion and increase the flow of traffic. The subsection (a) exclusion requires the agency to exercise judgment in drawing the line between major highway projects which are disqualified and smaller improvements which are not.

The decision of VTrans and the FHWA to consider the DCD project for CE status reflects a reasonable interpretation of the subsection (a) exclusion. The record evidence demonstrates that the project fits almost entirely within the existing highway footprint. The taking of property is limited to narrow strips from some abutting properties. The justification for the project is existing traffic congestion and safety, especially the back-up of traffic onto the I-89

ramps.  The project recognizes the future growth of traffic through development, but it is unlike the *West* case in which the construction of the interchange drove the development.

The agencies expressly considered the impact of the project on land use and development near Exit 16.  The Scoping Study identifies three purposes for the project: reducing crashes; reducing traffic delays and queues, and "increase[ing] development potential and opportunities for economic growth in the project area."  AR 000077  The discussion of development addresses the obstacle presented by traffic delays.  "Traffic congestion and poor intersection Levels of Service (LOS) limit the development potential of land in the vicinity of Exit 16 and create obstacles to the growth of existing businesses in the area due to state regulatory permit requirements."  AR 000077  The agencies recognized that improved traffic flow would permit more people to make use of the businesses in the area.  In the view of VTrans and the FHWA, that improvement, achieved through highway redesign was insufficient to disqualify the project from CE status on grounds of "significant impact on travel patterns."

The court concludes that the agencies' decision to proceed on a CE basis after recognizing that the project would speed the flow of traffic was not arbitrary or capricious.  At its heart, the Exit 16 project is very simple – traffic crosses to the other side of the highway to allow vehicles to enter the interstate ramp.  Then it crosses back.  The decision that this change (plus the relatively small-scale improvements to the Mountain View Drive intersection to the north) does not have a significant impact on travel patterns reflects a reasonable interpretation of subsection 771.117(a) as applying to projects which *significantly* increase capacity and volume.  The Exit 16 project seeks to handle existing and projected highway volume more safely and more quickly.  It does not increase the through travel lanes on Route 7, add a bridge or overpass, or provide access to a new destination.  It is a modification – ingenious and counter-intuitive to those of us accustomed to driving on the right – but it makes no significant change to travel patterns on Route 7 which remains the principal state highway between Chittenden and Franklin counties and the principal access road for the businesses located near Exit 16.

The court finds that the decision that the Exit 16 project was eligible for consideration for CE status because it did not significantly affect travel patterns is consistent with the regulations and follows a through consideration of the factors relevant to the CE determination.  The decision was made on the basis of a detailed and relevant factual record.  It follows case law in

multiple decisions that speeding or improving the flow of traffic does not disqualify a project from CE status. In the court's view, the agencies' decision on this point was not arbitrary or capricious.

### 2. The 2014 revisions to 23 C.F.R. § 771.117(d) and (c) changed the requirements for qualification for a CE

An agency making a decision subject to NEPA and the accompanying regulations must apply the regulations in effect at the time of decision. The FHWA regulations themselves state that the various versions have no application prior to their effective date. *See* 23 C.F.R. § 771.109 ("This regulation does not apply to, or alter approvals by the Administration made prior to the effective date of this regulation." (February 7, 2013 version).

The FHWA made the CE determination at issue in December 2013 following the submission of a letter from VTrans in July 2013. The version of § 771.117 in effect in 2013 applies. This is the version the defendants followed in reaching their decision.

The parties agree that a second CE determination will be required before VTrans proceeds with any construction. (Doc. 36, at 12, n. 5.) That determination will follow the regulations in effect at the time. Defendants recently filed a notice of exactly such a determination. (Doc. 52.) The court will not offer a view now about the issues raised by the amendment of the regulations in the years after 2013.

### 3. VTrans failed to conduct an assessment of all foreseeable impacts of the Exit 16 project

The neighborhood surrounding the Exit 16 interchange is host to two long-running controversies. The dispute in this court pales in comparison with the litigation over the state permitting for the Costco gasoline pump station and the DCD interchange.

Both projects required Act 250 permits. These are state land-use permits required for projects of sufficient scale. The permits are issued by District Environmental Commissions which conduct administrative hearings at which the parties, including opponents, may appear and offer evidence. The first appeal is to the Environmental Division of the Vermont Superior Court. The second is to the Vermont Supreme Court. Both the Costco Act 250 application and the

16

VTrans application for the Exit 16 project were appealed to the Environmental Division and the Vermont Supreme Court. The Vermont Supreme Court largely upheld the issuance of the permits.

The connection between the two projects is that the amended Act 250 permit issued for the Costco project conditions the permit on "completion of the Lower and Upper Mountain View Drive improvements and submittal by VTrans of a complete Act 250 application for the proposed Exit 16 improvements." AR 000567-68 Alternatively, Costco may fulfill the condition by "pay[ing] for the evaluation and implementation of modified signal timings along the Exit 16 corridor that optimize traffic conditions." AR 000567-68 Plaintiffs argue that these requirements in the Costco permit render the Exit 16 project an indirect cause of the Costco development and therefore defendants should have conducted an "in-depth review" of "the impacts of the Costco development. . . – traffic, pollution, noise, [and] stormwater impacts." (Doc. 33 at 18.)

NEPA requires a federal agency to consider all reasonably foreseeable consequences of its actions, including direct and indirect effects. 40 C.F.R. § 1508.8. This rule extends to the criteria for a CE as well as to the required scope of an environmental impact statement. 40 C.F.R. § 1508.4. Not every event connected in some fashion to agency action qualifies for consideration. The Supreme Court has interpreted NEPA "to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metro. Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766 775 (1983). The Court has compared the requirement to "the familiar doctrine of proximate cause from tort law." *Id.* at 775. *See Dep't of Trans. v. Public Citizen,* 541 U.S. 752 (2004) (EIS need not include remote effects over which the agency has no control).

The NEPA regulations address the issue of what may be considered the effects caused by agency action. 40 C.F.R. § 1508.8 defines these as:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of

land use, population, density or growth rate, and related effects on air and water and
other natural systems, including ecosystems.

The regulations also recognize cumulative impacts which "can result from individually
minor but collectively significant actions taking place over time." 40 C.F.R. § 1508.8.

Turning to the events in this case, Costco submitted its Act 250 permit in 2008 – well in
advance of discussion of the DCD project which originated in 2010 with the Fiscal Year 2011
Annual Work Plan issued by the CCMPO  AR 000001  Costco has long operated a large retail
store near Exit 16 which generates multiple vehicle trips every day.  It decided to add a fueling
station before the Exit 16 plans were developed.  The record contains no evidence that the
Costco development was directly caused by the highway planners' decision to improve the
traffic controls at Mountain View Drive or create the DCD intersection at Exit 16.

What the record does show is that in the course of developing the Act 250 permit for the
Costco fueling station, the District Environmental Commission imposed a condition that traffic
flow improve on Route 7, including the upgrade of traffic controls at the intersection with
Mountain View Drive and the submission of an Act 250 permit application for the Exit 16
project.  This condition does not make the Exit 16 project a "cause" of the Costco fuel station.
The permit condition was imposed after planning was underway for both projects.  VTrans and
the FHWA had no control over the conditions placed on the Costco development.

An analogy is helpful.  A person might wish to marry someone who is already married to
another.  He or she might have many reasons for wishing to marry.  We could consider each
reason to be a cause of their union.  The law requires a divorce before the second marriage can
occur.  But we do not think of the divorce as a "cause" of the second marriage.  We might call it
a condition, a prerequisite or a regulatory requirement, but few would describe it as a direct or
indirect cause of the marriage.

For similar reasons, the decision of the District Environmental Commission to impose a
traffic condition on the Costco project does not make the Costco project an effect of the Exit 16
project.  And, it certainly does not expand the scope of the environmental review of the Exit 16
project to the impacts of the Costco service station which have been exhaustively examined by
three tribunals in the Costco permit litigation.  The court does not agree that the omission of a

18

review of the environmental effects of the Costco development by VTrans and the FHWA is a violation of NEPA requirements.

Viewed in a deferential light as required by NEPA, the decision of VTrans and the FHWA to forego consideration of the environmental impact of the Costco fuel station as an aspect of the DCD project was reasonable. It was not an oversight. Counsel for R.L. Vallee brought the issue to the attention of the FHWA by letter dated June 25, 2013. AR 0001983 Rather, it is consistent with the principles of causation expressed in 40 C.F.R. § 1508.8. "Indirect effects [are those] which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." The decision of a state regulatory body to condition its permit for the Costco service station on certain steps towards completion of the Exit 16 project does not make the service station the effect or result of the federal action. Excluding the environmental effects of the service station from the CE determination was neither arbitrary nor capricious.

### 4. VTRANS did not rule out "significant environmental effects" with sufficient certainty

The version of 23 C.F.R. § 771.117(d) in effect in 2013 when VTrans and the FHWA determined that the Exit 16 project qualified for CE status required a finding that "significant environmental effects will not result" from the proposed action. In its application, VTrans wrote "nor is [the Exit 16 project] likely to induce significant alterations in land use, planned growth, development patterns, traffic volumes or traffic patterns. No significant environmental impact is expected to result from construction or maintenance of this facility." AR 000109 Plaintiffs argue that this language falls short of an unequivocal statement that significant environmental effects *will not* result.

The court interprets the phrases "not likely to induce significant alterations" and "no significant environmental impact is expected to result" as the functional equivalent of "will not induce" and "will not result." The VTrans author is plainly communicating his or her view that the project will not affect the environment. That this opinion is expressed as an expectation or prediction rather than an administrative fiat ("Let there be light") does not reduce or dilute the certainty of the statement below that required by the NEPA regulation.

5.  **The goal of improving traffic flow by constructing the DCD is a significant alteration in traffic patterns which disqualifies the project for CE status**

In this final objection, the plaintiffs return to the theme expressed in the first objection which is that the Exit 16 project cannot qualify for a CE because it improves the flow of traffic through the intersection.  Plaintiffs identify a contradiction between the VTrans statement in the application for CE status that the Exit 16 project will not induce significant alterations in traffic volumes or traffic patterns and the determination in the Exit 16 Scoping Study that the DCD configuration "performs substantially better than the conventional and roundabout alternatives by increasing capacity and reducing congestion…"  AR 000109

The two statements are not inconsistent.  The court has already concluded that "significant alterations in traffic patterns" for purposes of a CE determination refers to wholesale changes in the use of roadways by the population.  It does not refer to the particular changes at an intersection achieved through adding a turning lane or redirecting traffic in the DCD pattern.

The Exit 16 Scoping Study addresses the effect of the proposed improvements, including alternatives, on traffic patterns in the area.  The study considered both "background traffic growth" and the "future development growth in the Exit 16 area – which is a designated growth area in the Colchester Town Plan."  AR 00086  It used computer modeling of estimated congestion to estimate traffic delays and queues in 2028 for the existing conventional traffic signals, the DCD, and a roundabout.  The study predicted congestion under any of the three alternatives, reduced in the case of the DCD.  AR 000089  The study demonstrates that growth was already predicted and considered under any of the three options.  Unlike a new interchange, the DCD does not enable major new development.  None is predicted in any of the planning documents.  Instead, the planning documents demonstrate that the DCD design handles existing traffic and projected growth more efficiently.

In its CE application, VTrans pointed to the recommendation of the Exit 16 Scoping Study Steering Committee that "[t]he DCD performs substantially better than the conventional and roundabout alternatives by increasing capacity and reducing congestion as well as improving safety (by eliminating left turn conflicts with oncoming traffic)…"  AR000114  It found no indirect or cumulative effects as these terms are defined in the Council on Environmental Quality

20

Regulations, 40 C.F.R. § 1500-1508.  (It identified and considered direct effects on wetlands and noise.)

The court has considered the determination by VTrans and the FHWA that the positive effects of the project (including the DCD and the changes to Mountain View Drive) on existing and predicted congestion did not disqualify the project from CE status.  The court concludes that the agencies' decision on this point was not arbitrary or capricious.  It is consistent with case law cited above which authorizes CEs for highway projects which improve safety and traffic flow.

## IV.    Motion to reopen oral argument to discuss new facts (Doc. 48)

Plaintiffs seek to introduce newly uncovered extra-record evidence which they assert "bears on the question of whether all 'indirect effects' were property considered in issuing the Documented Categorical Exclusion at issue in this matter.  They point to a series of emails, commencing in 2018, in which Costco and VTrans discuss a special payment by Costco to expedite construction of the Mountain View Drive improvements.  The court declines to reopen the record to consider this material.  The issue before the court is whether the FHWA decision in 2013 was arbitrary or capricious.  Subsequent events as described by plaintiffs cannot have formed the basis for the 2013 decision.  The parties agree, moreover, that a further CE determination will be necessary in connection with the funding and final approval of the project.  By letter dated April 6, 2020, VTrans staff communicated their decision that following re-evaluation and changes in the scope of the DCD project, a categorical exclusion remains appropriate.  Compliance of the re-evaluation with NEPA is not before the court.  The motion to reopen is denied.

### Conclusion

Plaintiffs' motion for summary judgment (Doc. 33) is DENIED.  Defendants' cross-motions for summary judgment (Docs. 36, 39) are GRANTED.  Plaintiffs' motion to reopen oral argument (Doc. 48) is DENIED.

Dated at Rutland, Vermont, in the District of Vermont, this 8th day of July, 2020.

Geoffrey W. Crawford, Chief Judge
United States District Court